IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JOSEPH SANSOM and STANLEY BOND,
Trustee in the Bankruptcy for the Estate of
Joseph Sansom                                                                    PLAINTIFFS

v.                                    No. 4:23-cv-567-DPM

KIA CORPORATION, f/k/a KIA
MOTORS CORPORATION; KIA
AMERICA, INC., f/k/a KIA MOTORS
AMERICA, INC.; and JOHN DOES 1-3                                 DEFENDANTS

ORDER

Joseph Sansom, an experienced Kia automotive technician, cut his wrist while working inside the dashboard of a 2012 Kia Soul. It was a three-centimeter cut. A co-worker took him to the E.R. A few days later, he had surgery to repair the damaged tendon. He filed this products liability case against various Kia entities making several claims about the steel bracket that injured him. After Sansom and his wife filed a Chapter 7 bankruptcy petition, the trustee joined as a plaintiff. In a separate Order the Court has decided the parties' motions challenging the seven proposed experts. On Kia's motion for summary judgment, the Court holds that, while several of Sansom's claims fail as a matter of law, three are best addressed at trial.

\*

First, the Court denies Kia's motion for judgment based on the Workers' Compensation statute's exclusive remedy provision. The statute preserves an injured employee's right to sue third parties. Ark. Code Ann. § 11-9-410. Lawsuits like this one are commonplace.

Second, the Court grants Kia's motion for summary judgment on Sansom's claims for breach of implied warranties of fitness and merchantability. Contrary to Kia's argument, Sansom gave the required pre-suit statutory notice. But the Uniform Commercial Code's warranty obligations grow out of transactions—sales, leases, and the like. *Sawyer v. Pioneer Leasing Corp.*, 244 Ark. 943, 949–57, 428 S.W.2d 46, 50–54 (1968). Sansom was not involved in any such transaction; and he was not a buyer's employee; he was a car dealer's automotive service technician doing a repair.

As Sansom points out, Arkansas Model (Civil) Instructions 1010 & 1011 provide optional words for this kind of claim—use, consume, or be affected by the product. Sansom was affected by this vehicle. But that phrase captures the Code's extension of the warranties' benefits to a buyer's family members, household members, and guests. Ark. Code Ann. § 4-2-318. Sansom was not similarly situated. Saying that this car was sold at some point is no sufficient answer. The context of Sansom's injuries was too just far removed from that transaction. His solid claims lie elsewhere.

Third, Sansom's strict liability claim fails as a matter of law. If Kia supplied the car in a defective condition rendering it unreasonably dangerous, then this manufacturer would be strictly liable for harm proximately caused by the defect. Ark. Code Ann. § 16-116-101(a). Arkansas measures dangerousness in terms of the user's or consumer's reasonable expectations. Ark. Code Ann. § 16-116-202(7)(A); *see also* Robert F. Thompson, *The Arkansas Products Liability Statute: What Does "Unreasonably Dangerous" Mean in Arkansas?*, 50 Ark. L. Rev. 663 (1998).

> "Unreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary and reasonable buyer, consumer, or user who acquires or uses the product, assuming the ordinary knowledge of the community or of similar buyers, users, or consumers as to its characteristics, propensities, risks, dangers, and proper and improper uses, as well as any special knowledge, training, or experience possessed by the particular buyer, user, or consumer or which he or she was required to possess.

Ark. Code. Ann. § 16-116-202(7)(A).

The parties dispute whether Sansom was, in the circumstances presented, a "user" of the car. Kia says no, relying on *Elk Corp. of Arkansas v. Jackson*, 291 Ark. 448, 727 S.W.2d 856 (1987). Sansom says yes, arguing from the Restatement (Second) of Torts § 402A, comment l (Am. L. Inst. 1965), and Professor Brill's treatise. 1 HOWARD W. BRILL, ARKANSAS LAW OF DAMAGES § 33:14 (Nov. 2025 update).

This is an undecided issue under Arkansas law. The Court has found no Arkansas precedent about injured repair folks pursuing strict liability claims. *Elk Corp.* is in the neighborhood but not dispositive. The truck driver was not injured by some condition (*e.g.*, a sharp edge) of the shingles; he was injured by how they were bundled for shipping. The Arkansas Product Liability Act has roots in the Restatement's famous provision 402A. *Berkeley Pump Co. v. Reed-Joseph Land Co.*, 279 Ark. 384, 390, 653 S.W.2d 128, 131 (1983). But the Arkansas Supreme Court has not adopted, or addressed, comment l's interpretation that a person doing repairs is a user. The Arkansas Court of Appeals has not spoken on the issue, either. Professor Brill's learned, and always thoughtful, view about Arkansas law carries weight. Here it is best understood as a prediction rather than a summary of current law. This Court, however, need not make its own *Erie*-educated prediction about whether Sansom qualified as a user. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010). Assuming he was, as to him the bracket posed danger, but not an unreasonable one.

In general, dangerousness is measured with an ordinary user's or consumer's knowledge about risks in the circumstances. Ark. Code. Ann. § 16-116-202(7)(A). But "special knowledge, training, or experience" requires a different measurement. *Ibid.* Sansom knew about the risks and dangers involved in working under the dashboard of Kia vehicles. His specialized knowledge controls. *Berkeley Pump Co.*

279 Ark. at 394, 653 S.W.2d at 133; *Edwards v. Skylift, Inc.*, 39 F.4th 1025, 1028 (8th Cir. 2022) (Arkansas law).

Sansom was the foreman in Crain Kia's shop. He worked there for approximately two decades. He had been a Kia master certified technician for fifteen years. He was experienced in the repair he was doing when he was injured. He had done it more than one hundred times. He had done this repair more than twenty times on a Kia Soul, the model in issue. A little more than year before this incident, he had cut his finger working under a dashboard. A few days later, he went to an urgent care, concerned about a resulting infection.

On deposition, Sansom said this:

> Q: And you knew that there were stamped steel edges, right, on these parts of the vehicle?
> A: There were what?
> Q: Stamped steel sharp edges?
> A: Yeah. Not that sharp.
> Q: Not that sharp?
> A: No. They should have went through a desharpening tunnel thing, you know, to break that edge.
> Q: But you knew generally there were sharp —
> A: There were sharp things.
> Q: — pieces and components inside the vehicle?
> A: Most of the time, whenever you cut — if you was to cut the panel or something like that, where you would sharpen it yourself, you know.
> Q: Were there any sharper components in a Kia Soul than other models you worked on, such as a Kia Optima or Forte or Cadenza?

> A: Not to my knowledge. I mean, I haven't ever been cut like that on any of them others. No.

Doc. 68-1 at 107–08.

One would be hard pressed to find an individual as knowledgeable, trained, and experienced in working inside a Kia's dashboard as Sansom. He knew about the dangers of the sharp edges there. He'd been cut before. That the edge of this bracket was particularly sharp did not make it unreasonably dangerous to a trained and experienced person like Sansom. The exact degree of sharpness here was beyond his experience, but the essential danger from sharp things inside a dashboard was routine to a master certified technician such as Sansom. Kia is entitled to summary judgment on his strict products liability claim.

Fourth, Sansom's negligence claims go forward.

On warnings: Kia's repair protocol did not say that the technician should wear work gloves for protection during this task. It did for others done inside the dashboard. Sansom had a pair of these gloves in his tool box. He said he was "ADD" about his work and followed instructions. Given Sansom's expertise and experience, some uncertainty about how effective work gloves would have been against this particular poke (compare Hill's experiment with Andrews's), and some murkiness about exactly when Sansom did and did not use those gloves, his failure-to-warn claim is not a particularly strong one.

But some material facts are sufficiently murky to need ventilation at trial.

On manufacturing: Kia's design specifications for the steel bracket noted that "BURRS AND SHARP EDGES ARE NOT ALLOWED ON PART." *Doc. 73-5 at 6.* Sansom testified that this bracket was sharp-edged. His expert, Christopher Roche, tested it and concluded it was, too. In another place, the bracket had a burr. All this would support a verdict that Kia was negligent at some point or points in the manufacturing process. Kia argues hard that the bracket wasn't sharp. That's the deep disputed fact which prevents summary judgment on this claim.

On design: Roche testified to a feasible alternative design for the bracket, one with rounded edges. Other materials than steel, this expert also said, would work as well. Here, too, Kia offers conflicting proof from its experts. The jury must resolve these disputed facts.

*

Kia's motion for summary judgment, *Doc. 68,* is partly granted and partly denied. Sansom's negligence claims need a trial. All his other claims do not. This case is now first out for a jury trial on 9 February 2026.

So Ordered.

*D.P. Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

7 January 2026